See also 764 F.Supp. 1360.

**PHYSICIANS HEALTHCHOICE, INC.,** as assignee of the rights of certain members of the Automotive Employee Benefit Trust, **Plaintiff,**

v.

**The TRUSTEES OF the AUTOMOTIVE EMPLOYEE BENEFIT TRUST,** including Alfred S. Brodie, Joseph Garbina, Gerald R. Kottschade, Florence Markert, and other presently unidentified "John Doe" individuals, **Defendants.**

**The TRUSTEES OF the AUTOMOTIVE EMPLOYEE BENEFIT TRUST,** including Alfred S. Brodie, Joseph Garbina, Gerald R. Kottschade, Florence Markert, and other presently unidentified "John Doe" individuals, **Third–Party Plaintiffs,**

v.

**Ronald L. HASKVITZ,** Independent Administration Company, a Minnesota corporation, Association Marketing Systems, Inc., a Minnesota corporation, AGBS Company, a Minnesota corporation, f/k/a KBA Marketing Associates, Inc., d/b/a American Group Benefits Service, **Third–Party Defendants.**

Civ. No. 4–90–789.

United States District Court,
D. Minnesota,
Fourth Division.

Feb. 27, 1992.

Keith J. Halleland, Popham, Haik, Schnobrich & Kaufman, David R. Strand, Rider, Bennett, Egan & Arundel, Minneapolis, Minn., for plaintiff.

Gaylord W. Swelbar, Robert T. Torgerson, Hanft, Fride, O'Brien, Harries, Swelbar & Burns, Duluth, Minn., for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motion for summary judgment. The motion will be granted.

FACTS

The Automotive Employee Benefit Trust (the Trust) was created in 1982 to provide health care and other benefits to the employees of its member employers; the operations and business of the Trust constituted an employee welfare benefit plan under ERISA, 29 U.S.C. § 1001, *et seq.* From 1982 to 1987, the Trust offered health benefits through a self-funded major medical plan under which the members paid premiums to the Trust and received reimbursement for medical expenses incurred; in April 1987, however, the Trust contracted with plaintiff Physicians HealthChoice, Inc. (PHC), a health care services company with a network of health care providers. Under the arrangement, Trust members received treatment from health care providers who belonged to the PHC provider network. The providers billed PHC at a discounted rate for the services they rendered to Trust members. The Trust reimbursed PHC for the amounts PHC paid the providers and also paid PHC a service fee of five percent of the claims paid. This arrangement rested on three sets of contracts: the contracts between the Trust and its members, the contracts between PHC and its health care providers, and the contract between the Trust and PHC. PHC did not contract directly with the Trust members.

By March 1989, the Trust had fallen behind in its payments to PHC. In a July 1989 memorandum, PHC's controller reported that the Trust was $402,000 in arrears, that the arrearage would grow by $300,000, and that by the contract renewal date, PHC's total exposure on the contract would be $1.3 million. However, the memorandum also noted that PHC had earned approximately $500,000 in profits from the Trust contract and recommended against terminating the contract. Def.'s Mem., Ex. D. In November 1989, the Trust and PHC entered into two new contracts. In the first, the parties agreed to work at reach-

ing an agreement on the exact amount of the debt and agreed to procedures by which the Trust would reduce its debt to PHC. Def.'s Mem., Ex. E (hereinafter "the repayment agreement"). This repayment agreement was later amended to state that, while the exact amount in arrears was still in dispute, the Trust was indebted to PHC by at least $800,000. Def.'s Mem., Ex. G, ¶ 1. In the second November agreement, the parties renewed their administrative services contract; that agreement provided, among other things, that the Trust was "solely responsible for payment for Health Services rendered by Preferred Providers and non-Preferred Providers." Def.'s Mem., Ex. F § IV, ¶ A (hereinafter "the administrative services agreement").

The Trust did not satisfy the terms of the November repayment agreement, and in March 1990, the parties executed yet another agreement. Def.'s Mem., Ex. H (hereinafter "the March agreement"). The March agreement provided that the Trust's health benefit plan would be terminated on March 31, 1990 and that PHC would arrange for replacement coverage through PHC's parent corporation, Physicians Health Plan of Minnesota (PHP). Trust members living outside PHP's service area were to continue obtaining coverage from the Trust through April 30, 1990. Id. ¶ 1. In return, the Trust assigned to PHC certain rights, including the rights to any premiums owed to the Trust by Trust members. Id. ¶ 2(b). The Trust also transferred to PHC "all rights and interests in any and all assets of the Trust"; all funds received from the claims, rights, and assets assigned under the agreement were to be applied to reduce the Trust's indebtedness to PHC. Id. ¶ 2(f). The agreement further provided that the Trust retained any claims or causes of action it had against the Trust members, and that the Trust was to remain obligated to PHC for the health care claims already incurred. Id. ¶ 2(g) and 4.

When the Trust members were transferred from the Trust plan to PHP, PHC obtained assignments from some of the Trust members.[1] It also obtained assignments from employers who had participated in the plan. Pl.'s Mem., Aff. of Gail C. Krieger ¶ 4. These assignments assigned to PHC "any and all claims, rights, or causes of action that the undersigned has or may have against [the Trust] and/or its trustees, agents or representatives. . . ." Def.'s Mem., Ex. I. It is on the strength of these assignments that PHC, as assignee of the Trust members, brings this action.

Under the documents establishing the Trust, the trustees retained the right to terminate the Trust at any time. Def.'s Mem., Ex. A, art. VIII. Stating that the purpose of the Trust had been accomplished or had become impossible of accomplishment and that all assets of the Trust fund had been transferred to PHC pursuant to the March 1990 agreement, the defendant trustees dissolved the Trust effective September 28, 1990. Def.'s Mem., Ex. J. The debt to PHC remained unpaid.

PHC, as assignee of the Trust members, initiated this action, alleging that the Trust is indebted to PHC in the amount of $1.6 million, that the debt is a liability of the Trust that exists because of the trustees' mismanagement, and that the Trust and its members have incurred damages in the amount of the debt. Compl. ¶ 29–31. The trustees now move for summary judgment on the grounds that PHC cannot establish that the Trust or the Trust members have sustained a loss.

## DISCUSSION

A movant is not entitled to summary judgment unless the movant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). In considering a summary judgment motion, a court must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

---

1. PHC received assignments from 80 trust members. Def.'s Mem., Aff. of R. Thomas Torgerson ¶ 5. Defendants assert that in total, 4,500 members transferred from the Trust to PHP, but have pointed to no evidence supporting that assertion. Def.'s Mem. at 11.

The role of a court is not to weigh the evidence but instead to determine whether, as a matter of law, a genuine factual conflict exists. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir.1987). "In making this determination, the court is required to view the evidence in the light most favorable to the nonmoving party and to give that party the benefit of all reasonable inferences to be drawn from the facts." *AgriStor Leasing*, 826 F.2d at 734. When a motion for summary judgment is properly made and supported with affidavits or other evidence as provided in Fed.R.Civ.P. 56(c), then the nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir.1987), *cert. denied*, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988). Moreover, summary judgment must be entered against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Under ERISA, "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries ... shall be personally liable to make good to such plan *any losses to the plan resulting from each such breach....*" 29 U.S.C. § 1109(a) (emphasis added). The plain language of this section establishes three elements for a section 1109(a) damages claim: a breach of fiduciary duty, a loss to the plan, and a causal link between the breach and the loss.[2] In accordance with the statutory language, the United States Supreme Court has held that only losses to the plan, and not the extracontractual damages of a plan beneficiary, are compensable under section 1109(a). *Massa-*

*chusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Because section 1109 damages are available only for losses to the plan, courts have held that trustees are not liable in money damages for imprudent conduct that results in no loss to an ERISA plan. *Brock v. Robbins*, 830 F.2d 640, 647–48 (7th Cir.1987); *Whitfield v. Lindemann*, 853 F.2d 1298, 1305 (5th Cir.1988). Nor are fiduciaries liable for damages for losses to the plan that do not result from their breach. *Brandt v. Grounds*, 687 F.2d 895, 898 (7th Cir.1982). Defendants contend that they are entitled to summary judgment under section 1109(a) because, even if the trustees breached a duty owed to the Trust under the Trust documents or ERISA, plaintiffs cannot establish a loss to the plan or a causal link between any loss incurred and a breach of the trustees' duties.

### I. Is There a Causal Link Between the Alleged Breaches of Fiduciary Duty and the Alleged Loss to the Plan?

Plaintiffs assert that defendants breached duties owed the plan under the Trust documents and ERISA by failing to establish and collect sufficient premiums, obtain audited financial statements, monitor unpaid claims, supervise third-party administrators, market the plan appropriately, and provide for payment of claims when the trust was terminated. Pl.'s Mem. at 16. Plaintiffs assert that this mismanagement rendered the Trust unable to pay its debt to PHC, and therefore caused a loss to the Trust members in the amount of the unpaid debt. Defendants argue that in order to show a causal link between the trustees' action and the trust's alleged loss, plaintiffs must establish that the defendants engaged in misconduct in contracting with and obtaining services from PHC.

Defendants' argument is without merit. Assuming that the amount owing under the contract constitutes a loss, it is a loss

---

**2.** Section 1109(a) also provides for an action to compel fiduciaries to restore to the plan any profits that the fiduciary has made through the use of plan assets. In this case, however, plain-

tiffs allege only that the trustees' mismanagement resulted in a loss to the plan; they do not allege that the trustees profited from the use of plan assets.

that could have been caused either by the trustees' negligence in entering into the contract, or, as plaintiffs allege, by the trustees' failure to manage the Trust in a way that assured its ability to pay its bills. If the debt is a loss, and if the loss arose because the trustees did not manage the trust prudently, the causation requirement of section 1109(a) would be met. To require plaintiffs to show that the loss was caused by the trustees' action in entering into the contract, rather than by their actions subsequent to entering into it, would be an overly narrow reading of the causation requirement. Therefore, defendants' lack of causation argument does not entitle them to summary judgment.

## II. *Can Plaintiffs Establish a Loss to the Plan?*

■ Defendants' argument that plaintiffs cannot establish a loss to the plan has two prongs. First, defendants contend that the damages plaintiffs claim cannot, as a matter of law, be considered a loss to the trust. Defendants point out that in order to establish a loss to the Trust, plaintiffs must show a decrease in the value of the Trust estate. *Kleinhans v. Lisle Savings Profit Sharing Trust,* 810 F.2d 618, 627 (7th Cir.1987) (adopting for ERISA cases *Restatement (Second) of Trusts* § 205 (1979)); *Sommers Drug Stores v. Corrigan Enterprises, Inc.,* 793 F.2d 1456, 1464 (5th Cir.1986), *cert. denied,* 479 U.S. 1034, 107 S.Ct. 884, 93 L.Ed.2d 837 (1987); *Powell v. Chesapeake & Potomac Telephone Co. of Va.,* 780 F.2d 419, 424 (4th Cir.1985), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986). It is undisputed that the Trust's indebtedness to PHC resulted from legitimate services rendered by PHC to the Trust. Thus, defendants argue, even if the trust were required to pay PHC the amount owed, the payment would not constitute a loss or decrease in the value of the Trust estate, but would rather reflect the extinguishment of a legitimate debt. Defendants argue that, just as a person who purchases and takes possession of a lawn mower incurs no loss when he makes payments for

it, the Trust would incur no loss upon making payments for the services it received.

Defendants' second argument is that, even if the claimed damages could be considered a loss, plaintiffs cannot, as a factual matter, establish that the Trust has incurred a loss. Defendants argue that there is no present loss to the Trust. Because the Trust has been terminated, PHC cannot compel payment of the debt; even if it could compel payment, the trust has no remaining assets to be decreased in value. Thus, the amount left unpaid on the contract is not a present loss, but is instead a benefit to the Trust: the Trust received services from PHC without having to pay for them.

Nor, defendants argue, has the Trust sustained a loss in the form of its former members' liability for the medical services they received from PHC providers, because PHC has not established that the former members (on whose behalf PHC now sues) are liable to PHC for the trust's unpaid bills. Defendants assert that until PHC establishes that the former members are liable to PHC, there is no loss to the trust and any action on behalf of the members is premature. More significantly, defendants assert that PHC cannot hold the former members liable for the Trust's debt in the future, for two reasons. First, the contracts creating the arrangement between the Trust, its members, and PHC do not empower PHC to recover directly from the members. The contract between the Trust and PHC allows PHC recourse only against the Trust, the party with whom it contracted. The contract between the Trust members and the Trust obligate the members to pay premiums to the Trust, but not to pay PHC directly for PHC's services. Second, while the Trust had the right under the plan documents to assess additional premiums against the Trust members, the Trust did not assign that right to PHC; the Trust assigned PHC its right to receive premiums currently due or due in the future, but retained all other rights against the members. Def.'s Mem., Ex. H, ¶ 2(b), (g). Because the Trust did not assess additional premiums against its members prior to dissolution, defendants argue, the former

Trust members are not and cannot be subject to future liability to the Trust.

Plaintiffs' response largely ignores defendants' arguments regarding whether the Trust suffered a loss compensable under section 1109(a). Instead, plaintiffs devote the bulk of their brief to arguing that the trustees were negligent in their management of the Trust, that the Trust's dissolution violated ERISA and Minnesota law,[3] and that the trustees should not be allowed to avoid personal liability for their misconduct by unilaterally dissolving the Trust. As defendants note, however, the trustees' misconduct, while an indispensable element of a section 1109(a) claim, is irrelevant to the question of whether plaintiffs can establish the equally indispensable element of a loss to the plan. Absent a loss, plaintiffs' claim must fail, regardless of whether the trustees acted improperly.

Plaintiffs do not address defendants' argument that because the Trust received valuable services from PHC, the debt cannot, as a matter of law, be considered a loss to the plan. They do, however, dispute defendants' contention that the former Trust members can incur no loss as a factual matter. Plaintiffs assert that the former Trust members have been damaged because they have been unnecessarily exposed to suit for their unpaid medical bills. The health care providers who contracted with PHC to provide services to the Trust members agreed to accept as full payment the amounts paid by PHC and also agreed not to bill the members except for copayments, deductibles, and non-covered services. Def.'s Mem., Ex. B. Thus, the health care providers have no recourse against former Trust members for unpaid bills.

PHC asserts, however, that it does have recourse against the members for amounts the trustees left owing on PHC's contract with the Trust. The present action, PHC contends, is an alternative to lawsuits by PHC directly against the former Trust members. Pl.'s Mem. at 2. In support of

its claim that the members are directly liable, PHC points out that neither PHC's contract with its providers nor the assignments it received from Trust members limited PHC's right to pursue plan participants for their unpaid bills. However, PHC points to no contract language giving rise to its claimed right to seek compensation directly from former trust members. Nor does PHC point to any other source, such as ERISA or common-law principles, giving it the right to impose personal liability on the members. The mere fact that the contracts did not limit PHC's right of recourse does not establish that PHC had that right in the first place.

PHC's argument seems to be that because PHC contracted with the Trust to arrange for health care services for plan participants, and because PHC in fact arranged for those services, it has a right to recover payment for the services against those who received them. In support of this argument, PHC cites three cases in which health care providers sued ERISA plans to recover payment for services provided to plan participants. *Hermann Hospital v. MEBA Medical & Benefits Plan*, 845 F.2d 1286 (5th Cir.1988); *Misic v. Building Service Employees Health and Welfare Trust*, 789 F.2d 1374 (9th Cir. 1986); *St. Mary Medical Center v. Cristiano*, 724 F.Supp. 732 (C.D.Cal.1989). In each of these cases, plan participants received services from health care providers and in return for the services assigned their right to plan benefits to the health care providers. The health care providers in turn sued the plans to recover payment for the services they had provided. Plaintiffs assert that these cases establish PHC's right to sue plan participants for bills that the Trust left unpaid. PHC's position is that because PHC can hold the participants liable for the debt that the Trust owed PHC, the participants have suf-

---

3. Plaintiffs argue that the trustees violated Minn.Stat. § 62H.02 by failing to obtain aggregate excess stop-loss coverage to pay any incurred and unpaid claims in the event of plan termination. In response, defendants have pro-

duced a December 4, 1989 letter from the Minnesota Commissioner of Commerce acknowledging that the Trust was, at that time, exempt from section 62H. Def.'s Reply, Ex. M.

fered a loss that PHC, as their assignee, can recover from the trustees.

The cases cited, however, do not support PHC's claimed right to pursue plan members, because they are factually different from the case at hand. In the cases cited, plan members assigned their right to health care benefits to health care providers; here, plan members did not assign their benefits to health care providers, but assigned their rights against the Trust to the entity that provided the Trust with access to a provider network and with administrative services. Moreover, in the cases cited, the provider-assignees were allowed to recover from the plans on the strength of the plan members' assignment of health care benefits. It does not necessarily follow that the provider-assignees could recover from the plan members themselves, as PHC claims the right to do here.

The Court concludes that PHC has not come forth with evidence raising a genuine issue of fact regarding whether the Trust's indebtedness to PHC constitutes a compensable loss under ERISA. Whether a legitimate debt incurred in exchange for valuable services can constitute a decrease in the value of the Trust estate is questionable, at best. If the debt exists because of the defendants' mismanagement, and if PHC could hold the former Trust members directly liable for the debt, the members might have a valid action for damages against the trustees. However, PHC has failed to establish that it could hold the members liable for the debt; the Trust members did not contract with PHC, and PHC has pointed to no contractual provision obligating individual trust members to pay PHC for services rendered to the Trust. PHC may well have a valid contract claim against the Trust in the amount of the debt; it has not, however, made out a valid section 1109(a) claim. Defendants are therefore entitled to summary judgment.

### III. *The Third–Party Claims*

Defendants have brought third-party claims against various entities involved in the administration of the Trust, alleging that if plaintiffs recovered a judgment against defendants, the defendants would in turn be entitled to a judgment against the third parties for indemnity or contribution. Because plaintiffs are not entitled to a judgment against defendants, the third-party claims are moot, and the Court will therefore dismiss the claims without prejudice.

Accordingly, based upon the foregoing, and upon all the files, records and proceedings herein,

IT IS ORDERED that:

1. defendants' motion for summary judgment is granted; and

2. defendants' third-party claims are dismissed without prejudice.

LET JUDGMENT BE ENTERED ACCORDINGLY.