Gerald G. ROTH; Logan M. Ammon, Appellants,

v.

SAWYER–CLEATOR LUMBER COMPANY, Employee Stock Ownership Plan; Charles J. Sawyer; Clifford E. Sawyer, Appellees.

No. 94–3368.

United States Court of Appeals, Eighth Circuit.

Submitted March 14, 1995.

Decided July 27, 1995.

Rehearing and Suggestion for Rehearing En Banc Denied Sept. 20, 1995.

George R. Serdar, Minneapolis, MN, argued, for appellants.

Marc J. Manderscheid, St. Paul, MN, argued (Bruce J. McNeil, on the brief), for appellees.

Before MAGILL, Circuit Judge,
HEANEY, Senior Circuit Judge, and
MORRIS SHEPPARD ARNOLD, Circuit Judge.

MAGILL, Circuit Judge.

Plaintiffs Gerald G. Roth and Logan M. Ammon appeal from the district court's order granting summary judgment to Charles J. Sawyer and Clifford E. Sawyer, trustees of the Sawyer–Cleator Lumber Company Employee Stock Ownership Plan (the Plan). Roth and Ammon, who were participants in the Plan, claim that the district court erred when it determined that any breach of duty by the trustees resulted in no loss to the Plan. We reverse and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Roth and Ammon are former employees of the Sawyer–Cleator Lumber Company (the Company). Before its demise in 1991, the Company was a closely-held corporation engaged in wholesale and retail lumber sales in the Minneapolis–St. Paul area. In 1975, the Company established an employee stock ownership plan (ESOP) to provide retirement benefits to its employees. Under the Plan, each participant had one account consisting of Company stock, and another consisting of other investments. Because the Company was closely-held, one of the methods of distributing Plan benefits to participants was a "put option." Under the put option, the participants could require the Company[1] to purchase the stock owned by the participants.

Roth and Ammon retired in 1988 and 1989, respectively. At the time of their retirement, Charles J. Sawyer and Clifford E. Sawyer were trustees of the Plan. Roth and Ammon chose to exercise their put options. The stock sale was accomplished by means of a promissory note and stock pledge agreement. The Plan obligated itself to make payments to Roth and Ammon over ten years, and Roth and Ammon retained a security interest in their stock under the stock pledge agreement.[2] Roth and Ammon each received partial payment of the sums due under the promissory notes, but the Company began to experience financial difficulties. In December 1990, the Company terminated its business operations and the Plan defaulted on payments due under the promissory notes. In February 1991, the Company was forced into Chapter 7 bankruptcy, thereby rendering the Company stock owned by the Plan (and hence, Roth's and Ammon's security) worthless.

Roth and Ammon filed suit in June 1991, asserting state and federal claims against the Plan and the trustees. The district court dismissed the state law claims and granted summary judgment to the trustees on Roth's and Ammon's ERISA § 409(a)[3] breach of fiduciary duty claim, finding that the Company stock was "adequate security" under federal law. Roth and Ammon appealed, and this court reversed, holding that "the trustees have failed to show that there are no

---

1. If "employer securities are not readily tradable on an established market" (as in the case of a closely-held corporation), an employer must provide the employee with "a right to require that the employer repurchase employer securities under a fair valuation formula." 26 U.S.C. § 409(h)(1)(B) (Supp.1994). Department of Labor regulations permit the ESOP to assume the rights and duties of the employer. 29 C.F.R. § 2550.408b–3(j) (1993).

2. Participants may sell their stock to an ESOP (or an employer) on credit provided that they are given "adequate security and a reasonable interest rate for any credit extended." 29 C.F.R. § 409(h)(5)(B) (1993).

3. ERISA § 409(a), codified at 29 U.S.C. § 1109(a) (1985), provides:

 (a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary. A fiduciary may also be removed for a violation of section 1111 of this title.

genuine issues of material fact regarding the reasonableness of their conduct." *Roth v. Sawyer–Cleator Lumber Co. Employee Stock Ownership Plan,* 16 F.3d 915, 918–19 (8th Cir.1994) (*Roth I* ). After remand, the district court again granted summary judgment to the trustees on the ERISA § 409(a) breach of fiduciary duty claim, this time on the grounds that Roth and Ammon had not demonstrated the required "loss to the plan." All other claims involving the trustees having been resolved, the district court entered judgment for the trustees pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Roth and Ammon timely appeal.

## II. DISCUSSION

■ Summary judgment is appropriate when there is no disputed issue of material fact and the moving party is entitled to judgment as a matter of law. *Egan v. Wells Fargo Alarm Servs.,* 23 F.3d 1444, 1446 (8th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 319, 130 L.Ed.2d 280 (1994); Fed.R.Civ.P. 56(c). We review a grant of summary judgment de novo, applying the same standard as the district court. *Id.*

■ "The primary purpose of [ERISA] is the protection of individual pension rights...." H.R.Rep. No. 533, 93d Cong., 2d Session 1 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4639, 4639. In order to accomplish this purpose, a breach of fiduciary duty by a trustee[4] triggers several potential remedies. H.Conf.Rep. No. 1280, 93d Cong., 2d Sess. (1974), *reprinted in* 1974 U.S.C.C.A.N. 5038, 5100. One of these remedies is provided by § 409, which "provides that trustees may be personally liable, but only for losses 'to the plan.' " *Roth I,* 16 F.3d at 919 (quoting 29 U.S.C. § 1109(a)). We determine whether there is a "loss to the plan" by applying a three-step analysis. First, we decide whether the events underlying this action have resulted in a "loss." Second, assuming that a "loss" has occurred, we determine whether that loss is "to the plan" or merely to the beneficiaries. Finally, we determine whether the alleged breach of trust

resulted in the identified losses to the Plan. To the extent that there are ambiguities in determining loss, we resolve them against the trustee in breach. *Donovan v. Bierwirth,* 754 F.2d 1049, 1056 (2d Cir.1985) (citing *Wootton Land & Fuel Co. v. Ownbey,* 265 F. 91, 99 (8th Cir.1920)); *see* James F. Jordan et al., *Handbook on ERISA Litigation* § 3.05[C], at 3–114 (1992) ("Courts generally hold that ambiguities in measuring losses should be resolved against the breaching fiduciary.").

### A. Has anyone suffered a loss?

The district court relied upon two rationales to find that Roth and Ammon did not produce a prima facie case of loss to the Plan. First, the district court reasoned that in *Roth I,* this court noted "that the plaintiffs have never proffered evidence of loss to the plan." 16 F.3d at 920. Although the district court does not specifically label this as the law of the case, it may have treated this statement as law of the case. Second, in evaluating loss, the district court focused upon the assets of the Plan, but viewed the value of these assets in a "snapshot" fashion, and thus viewed it too narrowly.

■ The district court's first rationale may be quickly disposed of. Law of the case applies only to issues actually decided, either implicitly or explicitly, in the prior stages of a case. *Little Earth of the United Tribes, Inc. v. United States Dep't of Hous. & Urban Dev.,* 807 F.2d 1433, 1438 (8th Cir.1986); 2A *Federal Procedure: Lawyers Edition* § 3:705 (1994). However, in *Roth I,* we addressed the trustees' loss argument as follows:

The trustees here argue that the ESOP did not suffer a loss as a result of their decision to secure the plaintiffs' notes with Company stock. We decline to review this argument, however, because the trustees did not raise the loss issue in their memorandum supporting their summary judgment motion.

---

**4.** We assume arguendo that the decisions complained of by Roth and Ammon were a breach of fiduciary duty.

16 F.3d at 920. Thus, we expressly declined to resolve the issue of loss. As there was no decision concerning loss, the doctrine of law of the case does not apply. Although it is impossible to tell from the district court's order exactly how much weight it gave to our observations in *Roth I*, it is clear that the law of the case doctrine does not support a finding of no loss.

■■■■■ The district court's second line of analysis was to "focus[ ] on 'a decrease in the value of the Trust estate' to determine whether there has been a loss to the plan." Order at 8 (July 27, 1994). The district court relied upon *Donovan v. Bierwirth*, 754 F.2d 1049 (2d Cir.1985), and *Physicians Health-Choice, Inc. v. Trustees of Automotive Employee Benefit Trust*, 784 F.Supp. 1416 (D.Minn.1992), *aff'd*, 988 F.2d 53 (8th Cir. 1993) (*PHC*), to support this proposition. We believe that the district court's analysis of *Donovan* and *PHC* was incomplete. One cannot determine whether the assets of the ESOP were diminished in the abstract; a comparison must be made between the value of the plan assets before and after the breach. The district court failed to consider the time frame component of the loss calculation, and so doing implicitly focused upon too narrow a time frame. If the Plan's assets are compared immediately before and after the alleged breach (*i.e.*, the decision to secure the notes from the Plan with Company stock), the Plan has suffered no loss. Indeed, the only case in which there could be a loss under this "snapshot" approach would be when the breach consisted of an overpayment by the ESOP. This measure of loss is appropriate in cases where the loss is due to self-dealing or price manipulation. *See Donovan*, 754 F.2d at 1054–55. However, this case does not involve an overpayment or a breach of trust by self-dealing or price manipulation. In cases such as this, a broader time frame is appropriate. If the assets of the Plan before the alleged breach are compared with the assets of the Plan after the Company has entered bankruptcy,[5] there is a

loss: Some portion of the Plan's predecision assets were used to purchase the now worthless Company stock.

■■■■ *Physicians HealthChoice, Inc. v. Trustees of Automotive Employee Benefit Trust*, 988 F.2d 53 (8th Cir.1993), supports our conclusion. The *PHC* opinion cited by the district court is the district court opinion in a case that was affirmed with opinion by the Eighth Circuit. An affirmance by this court, even without opinion, is not equivalent to endorsement of the reasoning or language of the district court. 5 Am.Jur.2d *Appeal & Error* § 934, at 361–62 (1962 & Supp.1994); 5B C.J.S. *Appeal & Error* § 1857, at 295 (1958). The opinion of this court, which is the applicable precedent, is directly contrary to the district court's position. *PHC* involved an attempt by PHC, a health care provider, to recover payments from a defunct multi-employer welfare trust. PHC was neither a participant in nor a beneficiary of the trust; it was merely a creditor that had obtained assignments of "all claims, rights or causes of action" against the trust and the trustees from members and beneficiaries of the trust. In affirming the district court's grant of summary judgment against PHC on the basis that PHC had not shown a loss to the plan, Judge Loken wrote:

> PHC responds that 'losses to the plan' should include conduct that frustrates the interest of participants and beneficiaries in the continuing vitality of a plan. We agree that this is a valid ERISA concern. However, this action does not seek relief that will further that interest. [The remedy that PHC seeks] will not revive the Trust and will provide little if any benefit to Trust members and beneficiaries. In other words, although PHC purports to seek relief for the Trust on behalf of participants and beneficiaries, the suit is nothing more than an attempt to use § 1109 to enhance PHC's state law rights as a creditor of the Trust.

---

5. Although *Donovan* instructed the district court to exercise its discretion in determining the time frame for valuation, the situation in *Donovan* was slightly different: In *Donovan,* there was no single determinative event analogous to the Com-

pany's bankruptcy. Given the centrality of the Company's bankruptcy to Roth's claim, we believe that any reasonable time frame must include the bankruptcy.

For these reasons, we agree with the district court's decision to dismiss PHC's § 1109 claim. PHC has failed to identify a concrete loss to the Trust, and the remedy PHC seeks would further no cognizable ERISA interest of the Trust or its participants and beneficiaries. Although **we would not hesitate to construe 'losses to the plan' in § 1109 broadly in order to further the remedial purposes of ERISA,** we find no suggestion that Congress intended to provide third-party creditors with a new federal weapon to pierce a plan's organizational veil solely for their own benefit. This case, at bottom, involves nothing more.

988 F.2d at 55–56 (emphasis added). Judge Loken's opinion makes clear that the finding of no loss in *PHC* was based on application of the policy underlying ERISA: ERISA was intended to protect beneficiaries, not creditors. This policy resulted in a denial of § 1109 relief to PHC, a creditor. The same policy counsels in favor of making relief available to beneficiaries such as Roth and Ammon, as Judge Loken specifically noted.[6]

*Donovan v. Bierwirth,* 754 F.2d 1049 (2d Cir.1985), confirms our analysis. In *Donovan,* trustees breached a duty of loyalty to the ESOP by making a stock purchase at prevailing prices averaging $38.34 per share when fair market value as determined by an expert was $23 per share. Each share yielded dividends of $2.20 and was later sold for $47.55, resulting in a net profit of $11.41 per share. The Secretary of Labor sought to hold the trustees personally liable under § 409(a) for the amount of overpayment at the time the shares were purchased (*i.e.,* $15.34 per share). The *Donovan* court rejected this measure of loss and determined loss by comparing the ESOP's actual profit to potential profit that could have been realized in the absence of breach. This measure of loss compared the respective performances over an extended period of time. *Id.* at 1058. *Donovan* thus stands squarely for the proposition that loss must be determined by examining the assets of the plan as a whole, not at an instant as was done by the district court, but over a period of time. We have favorably cited *Donovan* for the measure of loss in a stock manipulation case, and have approved a district court case that relied extensively on *Donovan. Martin v. Feilen,* 965 F.2d 660, 671 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993). We believe that *Donovan* provides the appropriate analysis of the measure of loss in a case such as this.

Our analysis of loss is supported not only by ERISA cases from this and other circuits, but is reinforced by the analogous trust law which uniformly establishes trustee liability where a breach of fiduciary duty by the trustee results in later losses. The loss requirement of ERISA § 409(a) has been interpreted by looking to "principles developed in the common law of trusts, which in large measure remain applicable under ERISA." *Donovan,* 754 F.2d at 1055. One treatise summarizes the relevant trust law as broadly defining the types of losses that will result in trustee liability:

> [I]f a breach of trust results in a loss to the trust estate, the trustee is chargeable with the amount of the loss. Thus the trustee is subject to a surcharge if in breach of trust he invests trust funds in improper securities that fall in value. . . .

3 William F. Fratcher, *Scott on Trusts* § 205, at 238–39 (4th ed. 1987). The facts of this case present allegations that "in breach of trust [the trustees] invest[ed] trust funds in improper securities that f[e]ll in value." We see no reason why, since such actions cause a loss to a trust estate, similar actions should not be determined to cause a loss to the Plan. Thus, just as a trustee bank was held personally liable for loss to the trust estate where it purchased shares of a "stock or equity" fund in breach and these shares declined in value, *Heller v. First Nat'l Bank of Denver, N.A.,* 657 P.2d 992 (Colo.App.1982), we find a loss to the Plan where the trustees' decisions to

---

**6.** The district court recognized that its interpretation of "loss to the plan" would make it "questionable whether the receipt of inadequate security would ever be actionable under ERISA § 409(a)." Order at 11. We note that this result is contrary to ERISA's aforementioned remedial purposes. *See In re Windsor on the River Assocs.,* 7 F.3d 127, 130 (8th Cir.1993) (statute should be interpreted in light of congressional purposes).

make the Plan the obligated party and to secure the Plan's notes resulted in the Plan's acquisition of worthless stock.

## B. Is the entity experiencing the loss the Plan or a participant?

 In *Massachusetts Mutual Life Insurance Co. v. Russell*, 473 U.S. 134, 147, 105 S.Ct. 3085, 3092–93, 87 L.Ed.2d 96 (1985), the Supreme Court distinguished between a loss to a plan itself, for which trustees may be personally liable under § 409(a), and a loss to beneficiaries, for which trustees are not liable. *Roth I*, 16 F.3d at 919–20. Here, the alleged breach of fiduciary duty consists of (1) using Company stock to secure the promissory notes (2) executed by the Plan. *Id.* at 917. This breach results in two types of loss: The beneficiaries suffer a loss because their security interest is, due to the trustees' breach of trust, tied to the Company stock which is now worthless. This is a loss to the beneficiaries personally, which is not actionable under *Russell.* However, the Plan also has an interest in the stock due to the breach. The decision to make the Plan the obligated party on the notes is the direct cause of the Plan's possession of the shares of Company stock that are now worthless. Accordingly, we conclude that the loss is "to the plan" and is therefore actionable under ERISA § 409(a).

## C. Were the losses to the Plan caused by the trustees' breach?

 The district court also applied a faulty notion of the causality required between the breach and the loss. The district court concluded that "[n]othing in the record suggests that the trustees' decisions to secure the plaintiffs' promissory notes with

Company stock and to make the ESOP the obligated party on the plaintiffs' notes had any effect on the value of either the ESOP's assets or the Company stock." Order at 9–10. We reject this conclusion for two reasons. First, this statement is factually inaccurate. The trustees' decisions to secure the plaintiffs' promissory notes with Company stock and to make the ESOP the obligated party on the plaintiffs' notes are the cause-in-fact of the decrease in the ESOP's assets. But for these decisions, the Company, not the ESOP, would have purchased the now worthless shares. Although, absent the trustees' breach, the beneficiaries of the Plan might have had trouble obtaining payment of the notes in full due to the Company's bankruptcy, there would have been no loss to the Plan.[7] Moreover, this statement reflects a misapprehension of the law. The decisions to use Company stock as security for the Plan's notes need not cause Company stock to go down in value. Rather, these decisions merely must cause a loss to the Plan. If a breach of fiduciary duty caused the Plan to purchase Company stock which declined in value, the causal link between the breach and the loss is established, even if the Company stock would have inevitably declined in value. *See Donovan,* 754 F.2d at 1056–58; *Heller,* 657 P.2d at 992.

## III. CONCLUSION

 We hold that the decline in value of the Company stock held by the Plan qualifies as a loss to the Plan under ERISA § 409(a). Accordingly, we reverse the district court's grant of summary judgment on this issue. We remand this case for further proceedings consistent with this opinion.[8]

---

7. To the extent that Roth and Ammon's allegation of breach goes *solely* to the type of security given by the Plan to Roth and Ammon, as opposed to the decision to involve the Plan in the transaction, there is no loss to the Plan. The type of security given by the Plan affects only Roth's and Ammon's ability to recover the sums due to them after the Plan defaults. Thus, any losses due *solely* to this decision are not losses "to the plan."

8. Although not addressed by the dissent, Roth and Ammon's challenge has two aspects. Roth and Ammon argue that the trustees' breach of

fiduciary duty is due to their failure adequately to secure notes given from the Plan. Thus, they challenge: (1) the trustees' alleged failure adequately to secure the notes, and (2) the assumption of the notes by the Plan. The dissent interprets the challenge to involve only the first issue (*i.e.,* the collateralization decision). However, this characterization of Roth and Ammon's claim is not supported by the record. *See* Order at 9–10 (noting two aspects of challenge).

The record indicates that Roth and Ammon have consistently challenged the decision to obligate the Plan on the notes. As the dissent correctly notes, paragraphs 24 and 45 of the amend-

MORRIS SHEPPARD ARNOLD, Circuit Judge, dissenting.

This case is before us for the second time. In our first opinion, *Roth v. Sawyer–Cleator Lumber Co.*, 16 F.3d 915 (8th Cir.1994), we reversed the district court's grant of summary judgment and remanded for a reconsideration of certain legal issues. Among the legal issues that we identified for exploration on remand was the question of whether the plaintiffs could demonstrate that the plan had suffered a loss, for if it had not, no action would lie. *See* 29 U.S.C. § 1109(a). The court rather pointedly noted that "plaintiffs have never proffered evidence of loss to the plan," *Roth*, 16 F.3d at 920, a statement that the district court quite understandably took to mean that on remand plaintiffs were going to have to adduce some additional evidence or lose.

On remand, plaintiffs did not offer any additional evidence, though they were of course given the opportunity to do so. Instead, they stood on their original motion papers in which they maintained simply that the "trustees' failure to provide adequate security" to support the promissory notes given by the Sawyer–Cleator ESOP to the plaintiffs constitutes a breach of fiduciary duty. This under-collateralization theory was the only one that plaintiffs advanced in their effort to resist summary judgment on remand. As a result, they have forfeited other theories, if any, that they might have had to support their claim that the plan had suffered a loss. *See, e.g., Marion County Cooperative Association v. Carnation Co.*, 214 F.2d 557, 561–62 (8th Cir.1954), and *Durasteel Co. v. Great Lakes Steel Corp.*, 205 F.2d 438, 441 (8th Cir.1953).

Indeed, plaintiffs had years ago already abandoned any other theory of liability for loss to the plan when they responded to defendants' original summary judgment motion. In that response, plaintiffs devoted considerable space to defending their assertion that defendants "failed in their non-delegable duty to provide adequate security to support the terms of payment upon exercise of Plaintiffs' put options." Plaintiffs advanced no other theory in support of their complaint. It is true that in paragraph 45 of their complaint they had said that the trustees committed a breach of fiduciary duty "when they improperly implemented the put options by naming the Plan, rather than the Company, as the obligated party on the Promissory Note under the Ammon Agreement." It is not at all clear what this means: It would seem on its face to mean that there was something fundamentally illegal about

---

ed complaint clearly and specifically advance this theory, alleging that:

> The Trustees breached their fiduciary duties to [the plaintiffs] when they improperly implemented the put options by naming the Plan, rather than the Company, as the obligated party on the Promissory Note....

J.A. at 6, 8. The defendants were on notice of this theory. The transcript of oral argument submitted by the defendants in support of their motion for summary judgment indicates that Mr. Serdar, the attorney for the plaintiffs, stated that "the issue before th[e district] court [on summary judgment] is centered on the question of whether the plan trustees breached their fiduciary duty in structuring the put transaction as they did." App. at 75. "Structuring the put transaction" involves substantially more than the collateralization decision, and the defendants' familiarity with this description of the issue on summary judgment belies any claim of unfair surprise.

Additionally, in their opposition to the defendants' motion for summary judgment, Roth and Ammon describe their challenge as one that is:

> not in connection with the decision to make a single investment, but on a broader level with respect to the management of the plan. It is these larger decisions regarding the handling of the Sawyer–Cleator ESOP which give rise to this action for breach of fiduciary duty.

App. at 85. This description of their challenge is a broad one. In the face of such a broad description of the challenge, it simply makes no sense to hold that the plaintiffs have abandoned the theory embodied in paragraphs 24 and 45 of the complaint.

Roth and Ammon's appellate brief also challenges the decision whom to obligate on the notes, arguing that the breach of fiduciary duty is due to the failure adequately to secure notes *given from the Plan* (rather than the company). Br. at 8, 12, 13, 16. The dissent quotes several of these passages and interprets the language to include only the collateralization decision. However, the dissent does not address the "from the Plan" language found in each of the passages it quotes. This language cannot be ignored, and it is this language that presents the theory of paragraphs 24 and 45.

the Plan assuming the Company's responsibilities under the put option; but, as the court points out, this is specifically permitted by law. Whatever the claim may mean, defendants moved for summary judgment on it and the plaintiffs made no response whatever to that portion of defendants' motion. The only claim that survived, therefore, was that contained in paragraph 46 of the complaint, namely, the inadequate collateralization of the note given in exchange for the exercise of the put option. And it was on this basis that the court below rendered its judgment after remand.

This is the posture in which the case came back to us on appeal. In their brief, appellants repeatedly stated that they were complaining only about improper collateralization of the note. On page 8, for instance, they say that "the wrong complained of by the Plaintiffs is that the individual trustees failed to provide adequate security to support payments from promissory notes given from the plan to the Plaintiffs." On page 10, they repeat that defendants "breached their fiduciary duties to the plan by failing to provide adequate security for the promissory notes given by the plan to the Plaintiffs." On page 13, they reiterate that it is "this failure to provide adequate security, *and not failures in administration or investment* which leads to the wrong which should be remedied by ERISA" (emphasis supplied). Finally, on page 16, they state that "the breach of fiduciary duty results from the simple failure to provide adequate security for the promissory notes given by the plan to the Plaintiffs in payment for their retirement benefits." All of the citations provided by the plaintiffs in their brief are to statutes and regulations having to do with the duty to provide adequate security. *See, e.g.,* 26 U.S.C. § 409(h)(5)(B) and 29 C.F.R. § 2550.408b–3(*l*)(4).

Despite all this, the court resuscitates plaintiffs' five-year-old case by recasting their claim as a complaint about purchasing worthless stock. Plaintiffs never complained about that: Their vague asseverations in paragraph 45 of their complaint cannot reasonably be characterized as making such a complaint. Even if they could be so characterized, that claim, as the tedious rehearsal above was aimed at demonstrating, has been forfeited by plaintiffs' arguments in the court below and in this court.

The court reverses this case on grounds that were never addressed to the trial court and never even argued to this court on appeal. Not only did the trial court not have an opportunity to respond to the theory of the case adopted here, *see, e.g., Vaughn v. Sexton,* 975 F.2d 498, 503 (8th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1268, 122 L.Ed.2d 664 (1993), *see also* 10 C. Wright, A. Miller, and M. Kane, *Federal Practice and Procedure: Civil* 2d § 2716 at 650–54 (1983), the appellees did not either. As the court quite correctly observes, the fact (if it is one) that there was inadequate security given to the plaintiffs for their notes simply cannot support a claim of loss to the Plan, since the Plan would have suffered the same loss, whatever the security, because of the company's bankruptcy. The inadequacy, if any, of the security simply did not cause a loss to the plan. It merely caused a loss to the plaintiffs, a loss that is not remediable under 29 U.S.C. § 1109(a). That being the case, I would affirm the district court.

I therefore respectfully dissent.