Janice B. LECKEY;  Janice B. Leckey, Executrix of the Estate of Evelyn O. Knapp, a/k/a Evelyn Olliffe Knapp, Deceased also known as Janice Burger Leckey, Appellant

v.

Paul W. STEFANO;  Frank W. Jones, Administrators of the Estate of William E. Knapp, Deceased, and Trustees of the Insurance Trust of William Knapp, deceased.

Nos. 06–2483, 06–3161, 06–3162.

United States Court of Appeals, Third Circuit.

Argued April 24, 2007.

Opinion filed: Aug. 31, 2007.

As Amended Dec. 21, 2007.

**214**

William R. Caroselli, Esquire, Caroselli, Beachler, McTiernan & Conboy, Edward C. Leckey, Esquire (Argued), Pittsburgh, PA, Counsel for Appellant.

David A. Strassburger, Esquire (Argued), Harry F. Kunselman, Esquire, Strassburger, McKenna, Gutnick & Potter, Pittsburgh, PA, Counsel for Appellee.

Mary Beth Buchanan, United States Attorney, Eileen J. O'Connor, Assistant Attorney General, Kenneth L. Greene, Esquire, Michelle B. Smalling, Esquire (Argued), Department of Justice, Tax Division, Washington, D.C., Counsel for Amicus Curiae, Commission of Internal Revenue.

Before: McKEE and AMBRO, Circuit Judges, ACKERMAN,* District Judge.

## OPINION OF THE COURT

AMBRO, Circuit Judge.

This is a battle for William Knapp's estate. It is in federal court because he kept much of his wealth in employee benefit trusts that were subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461. Boiled down, plaintiff Janice Leckey, on behalf of herself and the estate of her deceased mother Evelyn Knapp (who initiated this suit before she died), claims that both ERISA and the terms of the various plans gave Evelyn[1] an interest in her husband's ERISA benefits. He, however, took lump-sum distributions of almost all of his plan assets before he died without Evelyn's consent and placed them in trusts that paid her some—but not all—of the money. The remainder went, through William's estate plan, to his children from a previous marriage.

In two orders—one granting partial summary judgment and one entering final judgment after a bench trial—the District Court denied Leckey any relief. This is a complicated case because it involves two different ERISA plans and three different kinds of ERISA causes of action.

One, brought under 29 U.S.C. § 1132(a)(2), is a derivative suit to redress the loss to the plan itself when William (allegedly) withdrew assets improperly. A threshold question in this claim is whether he had a duty to seek Evelyn's consent before taking a distribution at all. The District Court concluded that he did as a matter of law under the Retirement Equity Act of 1984 ("REA"), Pub. L. No. 98–397, 98 Stat. 1426 (codified in scattered sections of titles 26 and 29), an amendment to ERISA. We disagree because we give effect to a Treasury Department regulation that interprets the Act differently. We hold, rather, that whether the duty attached is a fact issue that depends on the contents of the plan instrument. Unfortunately, because the plan instrument has been lost and the parties offer different versions, both of which are supported by some evidence, we must remand for a factual finding on this issue. We also vacate the District Court's findings that the plan itself suffered no loss because it is contrary to our holding in *In re Schering–*

---

* Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

1. To make this opinion more readable, we refer to Evelyn and William Knapp by their first names. This permits us to avoid using confusing generic terms such as "Appellant," "Decedent," and "Plaintiff."

*Plough Corp. ERISA Litigation,* 420 F.3d 231, 235–36 (3d Cir.2005), and we vacate the Court's finding that William's actions did not damage Evelyn or Leckey because it is clearly erroneous.

The second cause of action, brought under 29 U.S.C. § 1132(a)(3), seeks equitable relief for William's improper withdrawal from a different ERISA plan. On this claim, the District Court granted summary judgment to Leckey on the issue of liability but did not believe it could grant a remedy after the bench trial. Having examined the record and the law, we see no legal or factual impediment to imposing a constructive trust on traceable assets that were wrongfully withdrawn, and so we remand for consideration of that remedy.[2]

## I.  Facts & Procedural History

As noted, Janice Leckey sues both in her personal capacity and as executrix of the estate of her mother Evelyn Knapp. The nominal defendants are Paul Stefano and Frank Jones as administrators of the estate of William Knapp and trustees of his residuary trust, both of which are part of his unified estate plan. Stefano and Jones are Pittsburgh attorneys appointed by the state probate court to act in these capacities. The real parties-in-interest are Charles Knapp and Linda Sumser, William's children by his first marriage and the primary beneficiaries of the residuary trusts. (For ease of use, we refer to the defendants collectively as the "Residual Beneficiaries" throughout this opinion.)

This dispute centers on the propriety of William removing certain assets from two employee-benefit-plan trusts without Evelyn's written consent. The plans were op-

erated by the American Carbyde Corporation ("AmCarb"), which William formed in 1985. Initially, AmCarb had three owners: William (71%), Charles Knapp (20%), and Leckey (9%). In November 1985, Charles Knapp withdrew his interest by having AmCarb buy back his interest, and William's share rose to 88%, Leckey's to 12%.

Before he formed AmCarb, William had significant assets invested in the employee benefit plans of two former employers, both of which were in Chapter 7 bankruptcy liquidation in 1985. All four plans in which William had assets were set to terminate, and so he created the AmCarb Profit Sharing Plan (and a related AmCarb Profit Sharing Trust) to allow him to continue deferring tax on his assets. He named himself administrator of the Plan and trustee of the Trust. He also named Leckey a trustee of the Trust, though she later testified that her role was almost entirely passive.

William transferred just over $500,000-worth of assets into the Profit Sharing Trust, all of which derived from his former employee benefit plans.[3] He effected this by taking a lump-sum distribution of his accrued benefits in all previous plans, in effect rolling over assets in one set of plans to another. Evelyn signed a written consent to the election, thus waiving her right to receive the benefits in the form of a qualified joint and survivor annuity ("qualified annuity"). William was the only participant in the AmCarb Profit Sharing Plan, and AmCarb never contributed anything to it, as it never achieved commercial success.

In 1985, William withdrew some $50,000[4] from the Trust and placed the

---

**2.**  Leckey's third cause of action, brought under 29 U.S.C. § 1132(a)(1)(B), is not pressed on appeal, as we explain in Part II, *infra.*

**3.**  Specifically, he transferred real estate in the Virgin Islands and an orange grove in Florida worth a total of $273,595, a limited partner-

ship interest worth $24,000, and cash in the amount of $208,199.

**4.**  The exact amount withdrawn is unclear, and the District Court did not resolve the issue because it ruled that the statute of limi-

money in individual accounts. In 1992, when he began winding up AmCarb, he withdrew the balance and again placed the money in individual accounts. To effect the 1992 transfer, William hired attorney James Wirtz. Using the copy of the Profit Sharing Plan and Profit Sharing Trust instruments that William provided,[5] Wirtz concluded that nothing prevented William from withdrawing the assets at his leisure. At William's direction, Wirtz developed a three-part estate plan. Important for our purposes is that William removed substantially all of the assets from the Profit Sharing Trust (though he did not formally wind it up) and placed them in "Insurance Trust B," a residuary trust that, upon his death, provided Evelyn with income for life. After her death, the trust corpus was to go to the Residual Beneficiaries (to repeat, William's children from a previous marriage). The trust corpus is largely intact and will remain so until this litigation is resolved.

In 1986, AmCarb created a pension plan (the "AmCarb Pension Plan") and a related trust (the "AmCarb Pension Trust"). William named himself administrator of the Pension Plan and trustee of the Pension Trust. He and Leckey were the only eligible participants. AmCarb contributed a total of $72,000 to the Pension Trust between 1986 and 1987. In 1992, William withdrew all of the money from the Trust and placed it in individual accounts. Upon realizing that Leckey was entitled to some of the money, he transferred $10,386 from his personal brokerage account back into the Trust account (and subsequently caused the Trust to pay her that money). That same year he formally wound up AmCarb, and the IRS approved the termi-

nation of the Pension Plan effective December 31, 1991.

William died in 1993, and Evelyn and Leckey brought this action in 1995. The essential claim is that William wrongfully withdrew funds from both AmCarb trusts and deposited them in personal accounts, which had the effect of depriving Evelyn of the death benefits that she would have received had the funds remained in the trusts. This claim is based both on an ERISA requirement that distributions be paid out in the form of a qualified annuity unless the spouse signs a written consent to an alternate form of distribution, as well as plan language to that effect. It is undisputed that William's distributions did not take the form of qualified annuities. It is similarly undisputed that Evelyn did not consent in writing to these alternate forms of distribution.

As noted, Leckey translates these facts and allegations into three causes of action: (1) wrongful denial of benefits, 29 U.S.C. § 1132(a)(1)(B); (2) breach of fiduciary duty causing a loss to the plan, 29 U.S.C. § 1132(a)(2); and (3) a request for individual, equitable relief to redress a violation of the REA's qualified annuity requirement, 29 U.S.C. § 1132(a)(3). The District Court granted summary judgment in Leckey's favor on the issue of whether the plans were subject to the ERISA qualified annuity requirement. It then held a bench trial on the issues of whether William breached his fiduciary duties in bad faith, caused a loss to the plan, and damaged Evelyn or Leckey. Following that trial, it concluded that William's actions caused losses neither to the plan nor to the plaintiffs. Therefore, it entered judgment in

---

tations barred any dispute about the withdrawal.

**5.** Whether these were correct copies of the plan and trust instruments in force at the time

is disputed. The substance and import of the dispute are discussed at length in Part III.A.2, *infra*.

favor of the Residual Beneficiaries, and Leckey appealed.[6]

## II. The § 1132(a)(1)(B) Claim

Section 1132(a)(1)(B) allows ERISA plan beneficiaries to sue their plans for benefits owed. For reasons we cannot discern from the record, the District Court did not award Leckey relief under this section, and Leckey does not press the matter on appeal.[7] Thus, we shall not address this claim further.

## III. The § 1132(a)(2) Claim—The Profit Sharing Trust

█ Section 1132(a)(2) allows plan beneficiaries to sue plan fiduciaries personally for breaching their fiduciary duties. A violation of those duties allows, by way of § 1109, three remedies: (1) making good on the loss caused by the breach, (2) restoring any profits made using the assets of the plan, and (3) any other equitable or remedial relief the court deems appropriate. Section 1132(a)(2) actions are derivative in nature inasmuch as the plaintiff must assert a loss to the ERISA plan itself (not merely an individual claim for extra-contractual damages). *Massachusetts Mut. Life Ins. Co. v. Russell,* 473 U.S. 134, 147, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985); *see also Graden v. Conexant Sys., Inc.,* 496 F.3d 291, 295 (3d Cir.2007). Consequently, the plan takes legal title to any recovery, which then inures to the benefit of the participants and beneficiaries who were injured.

Here, Leckey claims that William breached his fiduciary duty by withdraw-ing assets from the Profit Sharing Trust in a form other than a qualified annuity without Evelyn's consent. The District Court, however, ruled that this claim failed as a matter of law. To review that decision, we must resolve three issues: (1) whether William had a duty to take distributions only in the form of a qualified annuity; (2) if so, whether he breached that duty; and (3) if so, whether that breach caused a loss to the plan. We also address whether Leckey or Evelyn was damaged by William's act and whether the District Court properly ruled that any objection to the 1985 transfer is barred by the statute of limitations.

### A. Whether the Profit Sharing Plan Was Subject to a Qualified Annuity Requirement

#### 1. The Retirement Equity Act

Resolving cross-motions for summary judgment, the District Court ruled that the REA required William to obtain Evelyn's consent before transferring money out of the Profit Sharing Trust in a form other than a qualified annuity.

The REA amended ERISA. Its primary purpose was to protect surviving beneficiaries when their ERISA-participating spouses predecease them. *See* S.Rep. No. 98–575, at 12 (1984), U.S.Code Cong. & Admin.News 1984, pp. 2547, 2558. Under the REA, when a participant dies before becoming eligible to receive distributions of vested benefits, the surviving spouse is entitled to a qualified pre-retirement annuity. 29 U.S.C. § 1055(a)(2). (Under prior

---

6. The District Court had jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291. We review questions of fact for clear error and questions of law *de novo. Hooven v. Exxon Mobil Corp.,* 465 F.3d 566, 572 (3d Cir.2006).

7. In her brief, Leckey appears to abandon her § 1132(a)(1)(B) claim because it would be futile to sue a plan that no longer has any assets. While we have held that common-law principles of successor liability can aid ERISA plaintiffs in similar situations, *see Teamsters Pension Trust Fund of Philadelphia & Vicinity v. Littlejohn,* 155 F.3d 206, 208 (3d Cir.1998), we presume that counsel knows facts not before us that made this path unattractive here.

law, it was permissible for plans to provide that participants dying before becoming eligible to take distributions forfeited all accrued and vested benefits, thus leaving their surviving spouses with nothing.) In addition, the REA requires that plan fiduciaries pay out almost all benefits in the form of qualified annuities unless both spouses consent in writing to another form of distribution. 29 U.S.C. § 1055(a)(1) ("[I]n the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity. . . ."). Requiring the written consent of the non-participating spouse was purposeful: the Senate Finance Committee wrote that it included the rule "because the Committee believes that a spouse should be involved in making choices with respect to retirement income on which the spouse may also rely." *Id.* Thus, it was Congress's intent not just to provide the non-participating spouse income in the form of a qualified annuity, but also to ensure that he or she had a right to be involved in pension-related decisions.

While the REA's default rule that benefits must be paid out in the form of a qualified annuity applies to most ERISA plans, plans meeting the following three conditions are exempt from the requirement:

(i) such plan provides that the participant's nonforfeitable accrued benefit (reduced by any security interest held by the plan by reason of a loan outstanding to such participant) is payable in full, on the death of the participant, to the participant's surviving spouse (or, if there is no surviving spouse or the surviving spouse consents in the manner required under subsection (c)(2) of this section, to a designated beneficiary),

(ii) such participant does not elect the payment of benefits in the form of a life annuity, and

(iii) with respect to such participant, such plan is not a direct or indirect transferee (in a transfer after December 31, 1984) of a plan which is described in subparagraph (A) or (B) or to which this clause applied with respect to the participant.

29 U.S.C. § 1055(b)(1)(C). In layman's terms, this means that, for a plan to be exempt, it must (1) provide that accrued benefits go to the participant's spouse on his death, (2) not allow payment to the participant alone in the form of a life annuity, and (3) not have received money from a plan subject to the qualified annuity requirement.

■■■■ The parties agree that the Profit Sharing Plan met prongs (i) and (ii). The question is whether the Plan was a "transferee" of plans to which the requirements applied. Treasury Department regulations that interpret the REA provide:

If through a merger, spinoff, or other transaction having the effect of a transfer, benefits subject to the [qualified] annuity requirements of sections 401(a)(11) and 417 are held under a plan that is not otherwise subject to such requirements, such benefits will be subject to the [qualified] annuity requirements even though they are held under such plan. Even if a plan satisfies the [qualified] annuity requirements, other rules apply to these transactions. . . . A transfer made before January 1, 1985, and *any rollover contribution made at any time, are not transactions that subject the transferee plan to the [qualified] annuity requirements with respect to a participant.* If a plan is a transferee plan with respect to a participant, the [qualified] annuity requirements do not apply with respect to other plan participants solely because of the transfer.

26 C.F.R. § 1.401(a)–20(Q & A 5) (emphasis added).

As the District Court ruled, this regulation seems to exempt "rollover contributions" from the class of transfers that can trigger the qualified annuity requirement. Leckey argues that the Court misread the regulation. Specifically, she contends that the regulation merely provides that rollover contributions do not subject the *entire plan* to the qualified annuity requirement; rollover contributions do, however, subject the *individual participant* to them.

This reading is untenable because the regulation specifically states that a rollover contribution is not a transaction that subjects the transferee plan to the requirements "with respect to a participant." 26 C.F.R. § 1.401(a)–20(Q & A 5). The wording of the regulation is obviously administrative argot, but the District Court correctly concluded that it does not classify rollover contributions as transfers within the scope of § 1055(b)(1)(C). Thus, rollovers do not trigger the joint and survivor annuity requirements at all.

The Commissioner of Internal Revenue promulgated § 1.401(a)–20 pursuant to his power to prescribe all regulations necessary to the enforcement of the Internal Revenue Code. 26 U.S.C. § 7805. Specifically, the Code regulates whether a plan qualifies for tax-deferred status, which turns in part on its compliance with the qualified annuity requirement. 26 U.S.C. §§ 401(a)(11) & 417. Thus, it is within the power of the Commissioner to promulgate regulations concerning whether an ERISA plan complies with these requirements.

The question here is whether the regulation's distinction between rollover contributions and transfers accords with Congress's intent in enacting § 1055(b)(1)(C). The Commissioner, who is participating as *amicus curiae*, argues that the term "rollover" is used to describe a distribution of a participant's benefits from an ERISA trust followed by the participant contributing those benefits into another qualified ERISA trust.

This definition is consistent with the Code. Section 402 defines "eligible rollover distributions" as "any distribution to an employee of all or any portion of the balance to the credit of the employee in a qualified trust." 26 U.S.C. § 402(c)(4). "Eligible rollover distributions" are excluded from income (and thus not taxable) if they are actually "rolled over" (*i.e.,* contributed) to another qualified retirement plan within 60 days. 26 U.S.C. § 402(c)(1). Thus, the Commissioner's definition of rollover as a distribution followed by a contribution between two qualified retirement plans comes directly from the Code. It is important to note that rollovers are *voluntary* transactions that plan beneficiaries undertake for the purpose of deferring tax or shielding assets from creditors. *See* 11 U.S.C. § 541(b)(7) (excluding contributions to ERISA plans from a debtor's bankruptcy estate).

In contrast, the Commissioner interprets "transfer" in § 1055(b)(1)(C) as meaning an *involuntary* (from the participant's perspective) movement of benefits among ERISA plans—typically incident to a merger, acquisition, spin-off, or the like. He argues that this interpretation is sensible in light of how "transfer" is used in nearby sections of ERISA. In § 1054(g), ERISA prevents employers from amending plans to decrease benefits in many circumstances. The provision applies to "transfers" and to "plan mergers and other transactions having the effect of a direct transfer, including consolidations of benefits attributable to different employers within a multiple employer plan." 29 U.S.C. § 1054(g)(4)(B). This language suggests that "transfer" refers to involuntary movements of plan assets, not individual rollovers. Moreover, this section uses the "transferee plan" language of § 1055

to refer exclusively to involuntary transfers.

Perhaps more on point, § 1058 directly regulates plan mergers with the following language:

A pension plan may not merge or consolidate with, or transfer its assets or liabilities to, any other plan after September 2, 1974, unless each participant in the plan would (if the plan then terminated) receive a benefit immediately after the merger, consolidation, or transfer which is equal to or greater than the benefit he would have been entitled to receive immediately before the merger, consolidation, or transfer (if the plan had then terminated).

29 U.S.C. § 1058. Here again, ERISA uses the word "transfer" to refer to involuntary movements of substantially all of a plan's assets, not to voluntary, individual-scale rollovers.

Putting together the "cardinal rule that a statute is to be read as a whole" with the statutory interpretation canon *ejusdem generis* (a general term following specific terms should be limited to things similar to the specific terms), we can conclude that ERISA uses the word "transfer" to refer to involuntary movements of plan assets by plan administrators, not to distributions taken and reinvested by plan participants in another ERISA plan. *Cf. Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114–15, 121 S.Ct. 1302, 149 L.Ed.2d 234 (2001) (" '[W]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.' ") (quoting 2A N. Singer, Sutherland on Statutes and Statutory Construction § 47.17 (1991)); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221, 112 S.Ct. 570, 116 L.Ed.2d 578 (1991); *see also Tavarez v. Klingensmith*, 372 F.3d 188, 190 (3d Cir. 2004) (noting that the rule of reading a statute as a whole and *ejusdem generis* can work together to make the meaning of a statute plain).

In addition, the Commissioner argues that even if a plan receiving a rollover contribution is in some sense a "transferee," it is not a "transferee ... *of a plan,*" as it must be for the qualified annuity requirement to attach. 29 U.S.C. § 1055(b)(1)(C)(iii) (emphasis added). Rather, it is a transferee of an individual. The text is ambiguous because it is not clear whether the phrase "of a plan" means merely that the transferred assets are in some way traceable to a previous ERISA plan or that the plan itself, acting through its administrator, actively transferred the assets. The Commissioner's reading is persuasive because, in the rollover context, the plan from which the assets are transferred is entirely passive—to the point that calling the new plan its "transferee" is unnatural. The participant receives a distribution of his benefits free and clear of all encumbrances; thus, the assets received are no longer attributable to the previous plan in any meaningful sense.

The Commissioner also argues that the REA's legislative history supports the transfer/rollover distinction. The relevant House report explains that a plan not otherwise subject to the qualified annuity requirement becomes so if it "(1) receives a direct transfer of assets in connection with a merger, spin-off, or conversion of the plan, or (2) receives a direct transfer of assets solely with respect to a participant." H.R. REP. No. 98–655 (Pt. 2) (1984), U.S.Code Cong. & Admin.News 1984, pp. 2547, 2558. From this it appears that Congress intended to reach involuntary movements of assets, not voluntary contributions from a participant that came out of a previous distribution from another plan.

Further supporting the Commissioner's arguments is that while employers can,

under some circumstances, effect transfers of substantially all plan assets to other plans without the participants' consent, rollovers are by definition voluntary on the participant's part. Thus, transferring assets from a plan to which the qualified annuity requirement applies to one to which it does not could effectively void the requirement. Hence, § 1055(b)(1)(C)(iii) prevents that result by applying the requirement to the transferee plan. Rollovers, however, are a different story. When an employee receives a distribution from a plan subject to the qualified annuity requirement, it must come in the form of a qualified annuity unless the spouse consents at that time to have it paid in another form. Here, William elected to take all of his distributions from his prior plans in lump-sum form, and Evelyn consented in writing to that election. App. at 738. Thus, Congress's purpose of involving the spouse in the distribution decision was realized; it would not further that purpose to subject the AmCarb plans to the qualified annuity requirement.

Given the use of "transfer" in other sections of ERISA and the way the Commissioner's interpretation dovetails with the REA's history and purpose, it easily passes muster. Because we hold that 26 C.F.R. § 1.401(a)–20(Q & A 5) properly interprets the REA, we vacate the District Court's ruling that the regulation is invalid. Applying the regulation to this case, we hold that the REA does not subject the Profit Sharing Plan to the qualified annuity requirement.

### 2. The Profit Sharing Plan Instrument

■ In the alternative, Leckey argues that the Profit Sharing Plan instrument

contained qualified annuity provisions. She relies on one version of the Profit Sharing Plan instrument. The Residual Beneficiaries counter that Leckey's version was never adopted by AmCarb's board and is therefore invalid. The question we resolve is whether the record evidence supports granting summary judgment on this issue for either; if so, we will not waste the parties' time with a remand.

At trial, Leckey called Richard Cramer, William's personal attorney. Cramer testified that he drafted the Profit Sharing Plan and Profit Sharing Trust instruments at William's direction. Leckey submitted a version of the plan that contained qualified annuity language.[8] The cover page and the first page of the body of the plan are dated "7/1/85." The table of contents, however, which is between the cover page and the body text, is dated "6/26/86." Based on the date on the body of the plan (and not on personal recollection), Cramer testified that this version was in force no later than July 1985. Specifically, he testified that it was his firm's practice at the time scrupulously to type onto each draft the last date on which it was revised. Leckey also put in evidence a letter from Cramer to William dated July 2, 1985. The letter states that it includes the latest draft of the plan, trust instrument, a board resolution adopting the plan, and various other documents for him to sign and return. Leckey then admitted in evidence a letter dated July 8, 1985, from Edward Leckey,[9] another of William's attorneys, stating that he had enclosed executed copies of the documents sent on July 2. Unfortunately, the enclosures themselves were lost, so Cramer could not produce

---

8. Parroting the language of the REA, it required that any benefit payout be in the form of a qualified annuity unless Evelyn consented in writing to another form.

9. As we have throughout this opinion, we continue referring to Janice Leckey as "Leckey." In this Part, when referring to Edward Leckey, we use his full name.

them, but he testified that he believed that an executed board resolution was enclosed.

On cross-examination, the Residual Beneficiaries submitted a June 3, 1985, letter from Cramer to William and the enclosed draft of the Profit Sharing Plan. This version did not have a qualified annuity requirement; rather, it allowed William to have his benefits paid out in any form he chose. Next, they submitted a June 10, 1985, memorandum from Cramer to his file. According to it, Cramer spoke with Edward Leckey that day about the Profit Sharing Plan. Edward Leckey told him that William and his son Charles were having a variety of disagreements over the business and that William might turn the business over to Charles earlier than expected. Because of this, William was concerned about Charles being able to take control of the Profit Sharing Plan, which William wanted to avoid, as virtually all of the money in it was his. The June 3 version of the plan allowed the AmCarb board to remove the Profit Sharing Trust's trustees and the Profit Sharing Plan's administrator at any time. Thus, William wanted the plan and trust instruments redrafted to protect his positions in the event of a change in corporate control.

The Residual Beneficiaries also put in evidence a letter from Cramer to William dated June 11, 1985, stating that it enclosed revised versions of the Profit Sharing Plan and Profit Sharing Trust instruments. Specifically, the letter stated: "[t]he documents now designate you [William] as trustee and prevent your removal absent judicial determination of cause for removal." They further put in evidence the version of the Plan instrument sent with the June 11 letter; it contained revisions consistent with the transmittal letter. It did not include a qualified annuity requirement. Next, the Residual Beneficiaries submitted a June 26, 1985, letter from Edward Leckey to Cramer, stating that

enclosed were an executed copy of the Profit Sharing Trust instrument, an executed board resolution adopting the new Profit Sharing Plan, and the altered pages of the Plan instrument. The letter also indicated that William would like additional revision to secure the trustees' ability to administer and dispose the assets in the Trust. This letter, Cramer testified, was the impetus for making the revisions contained in the July 1, 1985 version and for sending his July 2, 1985, letter to William. Cramer acknowledged that his July 2, 1985, letter referenced changes to the plan administrator's and trustees' powers but did not mention the addition of a qualified annuity requirement. Moreover, Cramer testified that he did not actually remember when he added that requirement; he merely surmised from the date on the body of the plan that its addition must have been part of the July 1 round of the revisions. He did not recall so much as speaking with William or Edward Leckey about the requirement.

The Residual Beneficiaries questioned Cramer about an IRS form that his firm submitted on June 27, 1986, requesting a determination that the Profit Sharing Plan was qualified for tax-deferred status. Next to a question asking whether the plan defines the term "joint and survivor annuity," neither the "yes" nor the "no" box was checked. Next to a question asking how distribution may be made, the boxes "lump sum" and "substantially equal installments" were checked; the "annuity contracts" box was not checked. Next to the question "Does this plan comply with the payment of benefits provisions of section 410(a)(11)," which is the Code's qualified annuity requirement, "N/A" was typed in. In various places on the form, the responses referenced sections of the profit sharing plan. When compared to the alleged July 1 version (with the Qualified

annuity requirement), the page number references were often off by a page or two.

On redirect, Leckey put in evidence a copy of the plan instrument that was certified by the IRS as the version in its files. It contained the qualified annuity requirement and was identical to Leckey's alleged July 1 version. Moreover, on a schedule of the IRS form (which, Cramer testified, would have been submitted with the form itself, though it bore no date), the response referenced section 6.04 of the plan—the section with the qualified annuity requirement, and referenced the correct page number for that section on the alleged July 1 version.

Aside from Cramer's testimony and the related exhibits, the only other relevant evidence offered at trial was James Wirtz's testimony that the copy of the Profit Sharing Plan that William gave him did not contain the qualified annuity language. William hired Wirtz for advice on removing assets from the Profit Sharing Trust and Pension Trust. The District Court, without concluding which copy of the Profit Sharing Plan was actually in force,[10] found that William did not intentionally mislead Wirtz by providing him a copy without the qualified annuity language.

From all this evidence, the only thing clear is that which plan was in force is a material, disputed issue of fact with credible evidence on both sides of the question. Thus, summary judgment would not be appropriate, *see* FED.R.CIV.P. 56(C), and we must remand for the District Court to make a factual finding on this issue.

## B. Bad Faith

■ The District Court, citing our opinion in *Burke v. LaTrobe Steel Co.*, 775 F.2d 88, 91–92 (3d Cir.1985), ruled that in an ERISA breach-of-fiduciary-duty claim based on failure to follow the terms of the plan instrument, the plaintiff must show that the trustee failed to do so "in bad faith." We believe that the Court read *Burke* too broadly. In *Firestone,* the Supreme Court wrote that trust law fills in the details of ERISA fiduciaries' duties and how courts review their actions. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 110–12, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Second Restatement, in a section that the *Firestone* Court quoted and relied on, explains the degree of fault required to establish a trustee's breach of fiduciary duty:

10. We note that the Residual Beneficiaries argue that the District Court actually resolved this issue at trial. They point to a finding of fact that reads "the plan document [that Leckey argues for] could not have been the draft of the Amcarb Profit Sharing Plan submitted to [William] Knapp [on] July 2, 1985." *Leckey v. Stefano (Leckey II),* No. 95–108 (W.D.Pa. June 6, 2005), at 4. They argue that by negative inference the District Court must have accepted their version. We see their point, but in that same opinion the Court entered a finding that "the above discrepancies [in the various versions of the plan] do not prove when the spousal protection language was incorporated into the AmCarb Profit Sharing Plan." *Id.* at 6. In addition, the Court wrote in a previous order that the issue of which version governed would not be decided at trial because it was unnecessary in

light of the Court's interpretation of the REA. *Leckey v. Stefano (Leckey I),* No. 95–108 (W.D.Pa. Apr. 26, 2004), at 21 (granting in part and denying in part cross-motions for summary judgment).

We harmonize these statements as follows: the version that Leckey presented was not *itself* the version that William received on July 2, 1985, but the Court did not actually resolve whether the qualified annuity requirement was in the version that he did receive. Thus, we cannot agree that the Court resolved this factual issue.

In any event, we are loathe to deem an issue of fact decided when the Court's language is so unclear and when the Court itself wrote in a previous opinion that it would not decide the issue. To do so would risk deferring to a finding of fact that was never made.

*a. Scope of the rule.* Ordinarily a trustee does not commit a breach of trust if he does not intentionally or negligently do what he ought not to do or fail to do what he ought to do. In other words, he does not commit a breach of trust unless he is personally at fault. He may, however, commit a breach of trust where he is not personally at fault, as where he acts under a mistake of law or fact, as is stated in the comments which follow.

*b. Mistake of law as to existence of duties and powers.* A trustee commits a breach of trust not only where he violates a duty in bad faith, or intentionally although in good faith, or negligently, but also where he violates a duty because of a mistake as to the extent of his duties and powers. This is true not only where his mistake is in regard to a rule of law, whether a statutory or common-law rule, but also where he interprets the trust instrument as authorizing him to do acts which the court determines he is not authorized by the instrument to do. In such a case, he is not protected from liability merely because he acts in good faith, nor is he protected merely because he relies upon the advice of counsel. If he is in doubt as to the interpretation of the instrument, he can protect himself by obtaining instructions from the court. The extent of his duties and powers is determined by the trust instrument and the rules of law which are applicable, and not by his own interpretation of the instrument or his own belief as to the rules of law.

*c. Mistake of fact or law in the exercise of powers or performance of duties.* When the question whether the trustee has committed a breach of trust depends not upon the extent of his powers and duties, but upon whether he has acted with proper care or caution, the mere fact that he has made a mistake of fact or of law in the exercise of his powers or performance of his duties does not render him liable for breach of trust. In such a case he is liable for breach of trust if he is negligent, but not if he acts with proper care and caution.

Thus, if the trustee is authorized to invest trust funds in such securities as a prudent man would purchase, he is not liable if he invests in bonds which on the facts known to him are the sort in which prudent men would invest, although, owing to facts which he did not know and was not negligent in not knowing, the bonds were not in fact properly secured. RESTATEMENT (SECOND) OF TRUSTS § 201 cmts. a—c (1959). Thus, when a trustee exercises his authority, a mere mistake will not render him liable for a loss. Only fault—in the form of bad faith or negligence—will. When, on the other hand, a trustee takes action that exceeds his authority, he is strictly liable for any loss (and accountable for any profit). While this may seem harsh, "[a] trustee who is in doubt as to the interpretation of the instrument can protect himself by obtaining instructions from the court." *Firestone,* 489 U.S. at 112, 109 S.Ct. 948 (citing G. BOGERT & G. BOGERT, LAW OF TRUSTS AND TRUSTEES § 559 (2d rev. ed. 1980); RESTATEMENT (SECOND) OF TRUSTS § 201 cmt. b; *United States v. Mason,* 412 U.S. 391, 399, 93 S.Ct. 2202, 37 L.Ed.2d 22 (1973)).

Our prior decision in *Burke* dealt with a mistake in the *exercise* of the trustee's powers: the plaintiffs accused the administrator of improperly denying their claim for pension benefits when they refused to comply with a work-recall request. Determining who is eligible for benefits—far from being *ultra vires*—is one of a plan administrator's key functions. *See* 29 U.S.C. § 1102(a)(1) & (b)(4). Thus, *Burke* held that to allege properly a breach of fiduciary duty, a plaintiff must allege more than mere error in discharging that duty.

Burke, *775 F.2d at 91–92. Rather, he must allege some kind of fault.* Id.

In our case, William allegedly distributed trust assets in an unauthorized form. If true, this is a mistake in the extent of his powers, not in his exercise of them. Thus, following the Restatement as *Firestone* requires, fault is not an element of the breach. *Firestone,* 489 U.S. at 112, 109 S.Ct. 948 (quoting RESTATEMENT (SECOND) OF TRUSTS § 201 cmt. b). Moreover, even under a fault standard, Leckey has met her burden because an administrator who breaches "clear and unambiguous language" in the plan is not relieved of liability by acting in good faith, *Burke,* 775 F.2d at 92 (citing *Delgrosso v. Spang,* 769 F.2d 928, 938 (3d Cir.1985)); *see also* RESTATEMENT (SECOND) OF TRUSTS § 201 cmt. c. If Leckey is correct that the plan included a qualified annuity requirement, the language of that requirement was clear:

> [U]nless the Participant elects otherwise in the manner provided herein, the normal form of benefit distribution for a . . . married Participant shall be a qualified joint and survivor annuity. . . . In order for a waiver of a qualified joint and survivor annuity . . . to be effective, the waiver must be in writing and must be consented to by the Participant's spouse. The spouse's consent to a waiver must be witnessed by a plan representative or notary public. App. at 162. Given the clarity of this requirement, failing to follow it establishes fault under our precedent.

We reject the District Court's finding that confusion over which version of the plan instrument was in place could somehow justify William's actions. At all relevant times, he was administrator of the AmCarb Profit Sharing Plan, trustee of the AmCarb Profit Sharing Trust, and controlling shareholder and President of AmCarb. He directed the creation of the Plan and Trust, oversaw the various revi-

sions, administered both, and presided over and controlled the board that adopted it. In short, any confusion as to which version the AmCarb board put into effect was William's own creation. To use this self-created confusion to excuse the breach of fiduciary duties owed to a plan beneficiary would turn ERISA and trust law topsy.

In addition, William is ineligible for the advice of counsel defense. Even if it is available in this context (and the Restatement disavows it), an element of the defense is providing the attorney with complete and accurate information. *See Howard v. Shay,* 100 F.3d 1484, 1489 (9th Cir.1996); *accord Chao v. Hall Holding Co., Inc.,* 285 F.3d 415, 430 (6th Cir.2002) (adopting *Howard*). It is undisputed that William did not provide to Wirtz the alleged July 1, 1985, version of the plan. If that were the plan adopted by the AmCarb board, then William did not provide complete and accurate information, and so seeking and following the advice of counsel cannot exonerate him.

## C. Loss to the Plan

The District Court, applying its findings of fact to ERISA law, concluded that William's breach did not cause a loss to the Profit Sharing Plan. In analyzing whether that finding is wrong, we begin with the text of § 1132(a)(2). It allows beneficiaries to sue "for appropriate relief under section 1109." Section 1109 states, in relevant part, that "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach." From this, the elements of a § 1132(a)(2) claim appear to be (1) a plan fiduciary (2) breaches an ERISA-imposed duty (3)

causing a loss to the plan. *See Roth v. Sawyer–Cleator Lumber Co.*, 61 F.3d 599, 602 (8th Cir.1995). Assuming that the plan contained a qualified annuity requirement, we have already explained that William was a plan fiduciary and that he breached his duty with the requisite level of fault. As to the third element, the Supreme Court held in *Massachusetts Mutual* that § 1132(a)(2) actions must be brought on behalf of the plan itself—and must, therefore, seek to restore losses *to the plan*. *Mass. Mut. Life Ins. Co.*, 473 U.S. at 147, 105 S.Ct. 3085. It is not a vehicle for individual relief; rather, § 1132(a)(1) and (3) provide individual relief. *See Great–West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213, 122 S.Ct. 708, 151 L.Ed.2d 635 (2002) (holding that § 1132(a)(3) provides individual, equitable relief); 29 U.S.C. § 1132(a)(1)(B) (providing for individual recovery of wrongly withheld benefits). This is, of course, not to say that beneficiaries should not expect to benefit from § 1132(a)(2) actions. As beneficiaries, any assets restored to the plan will be distributed to them in accordance with the plan instrument.

The question, then, is whether William's breach caused a loss to the plan. Explaining how district courts should determine whether there has been a loss to the plan, the Eighth Circuit Court of Appeals has counseled that "a comparison must be made between the value of the plan assets before and after the breach." *Roth*, 61 F.3d at 603. Here, the comparison is stark: before William withdrew assets from the plan, it held nearly $500,000; when he finished, it was all but bereft of assets. Hence, a loss to the plan.

The Residual Beneficiaries argue, however, that this action is a paradigm for individual recovery, not recovery on behalf of the plan, as William's breach only took assets out of one participant's account.

Indeed, the Profit Sharing Plan only had one participant, so any loss to the plan is also a loss to one person's account. In *Schering–Plough*, 420 F.3d at 235–36, we held that losses need not be to all plan beneficiaries to be attributable "to the plan" in the § 1132(a)(2) sense; rather, it is possible for a loss to the plan to affect only a subset of beneficiaries. *Id.* In that case, the plaintiffs were former employees who had selected a particular investment package in their employer's 401(k) plan— one that they alleged was imprudent and should not have been offered. We held that the investment losses, though allocated to individual accounts, were still suffered "by the plan," and so § 1132(a)(2) was available. Under that logic, had but one person selected the imprudent package, he still would have been able to bring suit. Thus, there is nothing *per se* improper about an § 1132(a)(2) suit in which the plan suffers a loss that happens only to affect one individual's account. This result seems all the more correct in the context of a single-participant plan. We cannot imagine that Congress intended to cut off § 1132(a)(2) liability (which is, in most cases, the only means for recovering personally from a breaching fiduciary) because of the happenstance that the plan has only one participant.

The Residual Beneficiaries do, however, cite cases that emphasize the number of people affected by the alleged breach of duty. In particular, they cite *LaRue v. DeWolff, Boberg, & Assocs.*, 450 F.3d 570, 574, *clarified on panel reh'g* 458 F.3d 359, 362 (4th Cir.2006), in which the Fourth Circuit Court of Appeals held that an individual alleging that his plan account lost money because the administrator failed to carry out his investment instructions does not assert a loss to the plan. *LaRue* is complicated by the fact that the plaintiff did not argue to the District Court a § 1132(a)(2) violation, and did not plead a

loss to the plan. Still, *LaRue* is in tension with *Schering–Plough* because it emphasizes that the loss only affected one beneficiary, whereas we read *Schering–Plough* as focusing on whether the plan itself actually lost money no matter the number of individual accounts affected.[11] The Residual Beneficiaries also cite *Matassarin v. Lynch*, 174 F.3d 549, 566 (5th Cir.1999), in which the Fifth Circuit Court of Appeals held that a § 1132(a)(2) claim could not proceed because it would only inure to the benefit of some of the plan's beneficiaries. The rationale, however, is principally that there was no loss *at all.* Thus we do not read it as disagreeing with our decision in *Schering–Plough.*

The other cases that the Residual Beneficiaries cite do not support their position. In *Horan v. Kaiser Steel Retirement Plan*, 947 F.2d 1412, 1418 (9th Cir.1991), the plaintiffs did not claim that the administrators' decision to pay benefits directly rather than by purchasing an annuity had harmed the plan; in fact, the Court pointed out that it had improved the plan's bottom line. Here, on the other hand, William left the plan nearly bereft of assets. Similarly, in *Lee v. Burkhart*, 991 F.2d 1004, 1009 (2d Cir.1993), the plaintiffs sought individual damages stemming from the administrator's failure to give notice as to how the plan was funded; there was no colorable allegation of loss to the plan.

In sum, we follow the text: § 1132(a)(2) provides a proper cause of action when a beneficiary can show a loss suffered by the plan. Nothing in the text makes the number of beneficiaries affected relevant. Here, assuming Leckey's version of the plan instrument, William improperly emptied the plan of assets. That loss was suffered by the plan, and so § 1132(a)(2) is available. The District Court's findings to the contrary were premised on a misunderstanding of the law, and we vacate them.

### D. Damages

At trial, the Residual Beneficiaries introduced evidence showing that William placed the assets that he took out of the Profit Sharing Trust into a residuary trust that provided Evelyn income for life (principal to the Residual Beneficiaries upon his death). From that trust she received some $172,000 while she was alive. The Beneficiaries' expert testified that she would only have received some $145,000 had the Trust assets been used to purchase a qualified annuity.[12] On that basis, the District Court found that Evelyn was not damaged by William's breach of duty.

█ We take a very different view of the damages issue: when William misappropriated plan assets, a constructive trust arose immediately for Evelyn's ultimate benefit. *See* AUSTIN W. SCOTT & WILLIAM F. FRATCHER, THE LAW OF TRUSTS § 426.4 (4th ed. 1988) ("Where the title to property is acquired by one person under such circumstances that he is under a duty to surren-

---

11. We acknowledge that the Supreme Court has granted *certiorari* in *LaRue*, partially (we assume) on the basis of its tension with *Schering–Plough* and similar cases in other circuits. *See* Brief for the United States of America as *Amicus Curiae, LaRue v. DeWolff, Boberg & Assocs., Inc.*, No. 06–856 (U.S. pet. for *cert.* filed Nov. 6, 2006) (approving of *Schering–Plough* and arguing that the Court grant *certiorari* and reverse). Because of the differences in facts and posture, it is unclear whether the Supreme Court's decision will affect our case. Therefore, we merely apply our Court's precedent.

12. We note that we are more than skeptical of this testimony, as the "expert" was not an actuary and did not claim any expertise in annuity pricing. He was, rather, a general securities broker, and his methodology (if it can be called that) was taking the average price of current qualified annuities and discounting for the passage of time. He did not price actual 1992 annuities.

der it, a constructive trust *immediately* arises." (emphasis added)); *see also* RESTATEMENT (FIRST) OF RESTITUTION § 160 (1937). It encumbered *all* misappropriated assets *and their proceeds*. RESTATEMENT (FIRST) OF RESTITUTION § 205. When residuary trust assets were paid to Evelyn during her life, they came out of money encumbered by the constructive trust, and so those payments reduced the amount over which the constructive trust was imposed. Essentially, when the residuary trust paid money to Evelyn, it was merely conveying the *legal* title to assets of which she already held *beneficial* title (via the constructive trust). Thus, the payments can (and indeed must) be used to reduce the amount of money that the Profit Sharing Trust can recapture both from the residual trust and in damages from William's estate.

We cannot accept the Residual Beneficiaries' argument that Evelyn received all to which she was entitled. Had William never removed the assets from the Profit Sharing Trust, Evelyn would have acceded to them on his death. Assuming that the plan contained a qualified annuity requirement, she had a right to object to any removal of trust assets other than in that form, and we cannot know to what she would have agreed had William not removed the assets. If the plan contained a qualified annuity requirement, William died after illegally removing assets from the Trust, and so the proper remedy for this 29 U.S.C. § 1132(a)(2) violation is to restore those assets. *See* 29 U.S.C. § 1109(a). Moreover, any proceeds from the assets removed are properly characterized as the profits from a breach of trust and must also be restored. *Id.*

### E. The 1985 Transfer

Leckey's § 1132(a)(2) claim comprises William's transfers of assets in 1985 and 1992. The District Court granted summary judgment in the Residual Beneficiaries' favor on the 1985 transfer because the statute of limitations expired before Leckey brought this suit. We agree.

■ ERISA provides a six-year statute of limitations. 29 U.S.C. § 1113. Leckey admits that she filed suit more than six years after the alleged breach, but she notes that, in cases of fraud or concealment, the statute does not begin to run until the breach was or should have been discovered. *Id.* To invoke that provision, however, the defendant must have taken "affirmative steps to hide its breach of fiduciary duty." *Ranke v. Sanofi–Synthelabo, Inc.*, 436 F.3d 197, 204 (3d Cir.2006). Here, Leckey asserts that William actively concealed the breach from her by describing an account that contained the withdrawn funds as a "personal account." Even if this were sufficient to raise a fair inference of active concealment (which we doubt), Leckey's own deposition testimony is fatal: she admitted to knowing that William habitually took money out of the Profit Sharing Trust for living expenses as early as 1987. Thus, her own admission establishes that she knew money was leaving the Trust in a form other than a qualified annuity by that time. The limitations period, then, expired no later than 1993—before this suit was filed in 1995.

### IV. The § 1132(a)(3) Claim—the Pension Plan

Section 1132(a)(3) allows ERISA beneficiaries to sue "to enjoin any act or practice which violates any provision of [ERISA] or the terms of the plan, or to obtain other appropriate equitable relief to redress such violations or to enforce any provisions of [ERISA] or the terms of the plan" (internal subparagraph and clause divisions omitted). Here, Leckey seeks equitable relief to redress William's violation of ERISA by improperly withdrawing assets

from the Pension Trust. The District Court, however, denied relief. To determine whether this was correct, we address the following issues: (1) whether the withdrawal violated ERISA, and (2) whether an equitable remedy is available.

### A. Whether William Violated ERISA by Withdrawing Assets from the Pension Trust

■ Finding a violation of ERISA is a prerequisite to awarding relief under § 1132(a)(3). The parties agree that the Pension Plan is subject to the qualified annuity requirement of § 1055. In its summary judgment order, the District Court recited as undisputed facts:

In January 1992, W. Knapp transferred all of the funds from the AmCarb Pension Plan into a brokerage account in his name only. E. Knapp never consented to such transfer. In May 1992, W. Knapp transferred approximately $10,386, representing the amount of benefits due J. Leckey, back into the AmCarb Pension Plan's bank account. J. Leckey was subsequently paid that amount. The balance of the AmCarb Pension Plan withdrawals, approximately $61,614, remained in W. Knapp's personal brokerage account until his death in February 1993. Under the terms of the AmCarb Pension Plan, any balance in W. Knapp's pension account at the time of his death was to be distributed to his spouse, E. Knapp.

*Leckey I*, at 5–6. Thus, it is undisputed that William transferred money out of the Pension Trust without complying with those requirements.

These findings appear sufficient to establish an ERISA violation, but one of the District Court's conclusions at trial complicates the issue. First, it stated in a footnote that it "finds no evidence of bad faith by [William] Knapp in the termination of, and distribution of assets from, the AmCarb Pension Plan." *Leckey II*, at 14 n. 7. This relates back to the Court's conclusion that, "[i]n order to succeed on [the] breach of fiduciary duty [§ 1132(a)(2)] claims, Plaintiff must prove that Knapp failed to follow the terms of the plan in bad faith." *Id.* at 12 (citing *Seborowski v. Pittsburgh Press Co.*, 188 F.3d 163, 170 (3d Cir.1999)). It is true that making out a valid claim under § 1132(a)(2) requires proving a breach of fiduciary duty, which, in certain circumstances, requires a showing of fault (negligence or bad faith). *See* Part III.B, *supra.* But this claim is brought under § 1132(a)(3), and making out such a claim does not require bad faith; it merely requires a violation of ERISA.[13] Thus, the District Court's conclusion that William did not act in bad faith is not relevant to this claim. All that matters is the District Court's conclusion on summary judgment that William's withdrawal from the Pension Plan violated ERISA. *See Leckey I*, at 22.

### B. Whether an Appropriate Equitable Remedy Is Available

■ Despite finding a violation of ERISA, the District Court did not order relief on Leckey's § 1132(a)(3) claim. The two reasons it gave were a lack of bad faith, which the previous section has explained is not relevant, and a lack of "evidence that the pension plan suffered any loss." *Leckey II*, at 14. But § 1132(a)(3) actions are *individual* actions, not actions on behalf of the plan. *See Varity Corp.*, 516 U.S. at 510, 116 S.Ct. 1065. Hence, the § 1132(a)(2) requirement of showing loss to the plan does not apply. *Id.*

---

13. In *Varity Corp. v. Howe*, 516 U.S. 489, 510, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), the Supreme Court noted that § 1132(a)(3)'s language is broad enough to cover violations of any of ERISA's provisions. *Id.*

█ The real impediment to awarding relief under § 1132(a)(3) is that only traditional equitable remedies are available. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993); *accord Great–West*, 534 U.S. at 209–10, 122 S.Ct. 708. Legal remedies like money damages—and even *legal* restitution—are not allowed. *Great–West*, 534 U.S. at 213, 122 S.Ct. 708. Thus, we can only accord Leckey relief if she has properly requested a remedy traditionally available in equity.

█ In her complaint, Leckey requested that the District Court "[g]rant mandatory injunctive relief directing that the defendant Administrators and Trustees transfer to [Leckey] all assets which were wrongfully distributed from the AmCarb Pension Plan, together with interest thereon." App. at 95. While styled as a request for injunctive relief, it is clear from the language that Leckey requested a restitutionary remedy; that is, she asked the Court to disgorge assets rightfully hers.

According to the Supreme Court, not all restitutionary remedies were traditionally available in equity; rather equity would restore only "money or property identified as belonging in good conscience to the plaintiff [that] could be easily traced to particular funds or property in the defendant's possession." *Great–West*, 534 U.S. at 213, 122 S.Ct. 708 (citing 1 Dobbs, Law of Remedies § 4.3(1), at 587–88; Restatement (First) of Restitution § 160 cmt. a; 1 G. Palmer, Law of Restitution §§ 1.4, 3.7 (1978)). Here, Leckey alleges that the funds wrongfully withdrawn from the Pension Trust were deposited in a Charles Schwab brokerage account that is currently an asset of William's estate (and thus under the control of the nominal defendants). The Residual Beneficiaries admit that the account is an asset of the estate. App. at 1082. Because some of the disputed assets are in an intact, traceable fund, equitable relief in the form of a constructive trust is available. Restatement (First) of Restitution § 160; *see also Skretvedt v. E.I. DuPont De Nemours*, 372 F.3d 193, 213 (3d Cir.2004). The details, however, we leave for the District Court to determine on remand in accordance with common-law tracing rules.

It is difficult to determine the precise grounds for the District Court's refusal to accord Leckey relief for William's violation of the qualified annuity requirement imposed on the Pension Plan, but the Residual Beneficiaries argue that one of them (in addition to those already discussed) was its finding that neither Leckey nor Evelyn was damaged by William's breaches of duty. Indeed, the District Court did enter a blanket finding of fact that "[t]here is no evidence that Evelyn Knapp ... was harmed by any alleged breach of fiduciary duties on the part of her husband." *Leckey II*, at 11. With regard to the Pension Plan, this finding is clearly erroneous. The evidence indicates (and, indeed, no one disputes) that the money from the Pension Trust went into William's personal brokerage account, where it stayed until he died. Upon his death, the account became an asset of his estate, and nominal defendant Stefano himself testified that Evelyn received nothing from that account after William's death. App. at 1082. Because ERISA required that the Pension Trust money be paid in the form of a qualified annuity from which she would have benefited, she was obviously damaged by William's transfer of the funds to a source from which she received nothing. While declaring a finding of the District Court clearly erroneous is not something we take lightly, we see nothing in the record supporting its assertion that Evelyn was not damaged.

## V. Conclusion

We affirm the District Court's grant of summary judgment on the issue of the

1985 transfer. We vacate its entry of judgment in favor of the Residual Beneficiaries on the remainder of the § 1132(a)(2) claim and remand for further proceedings. The key issue on remand is factual: whether the plan instrument in force contained a qualified annuity requirement. If not, the claim fails. If so, the Court will have to determine the damages.

We also vacate the District Court's entry of judgment in favor of the Residual Beneficiaries on the § 1132(a)(3) claim and remand for further proceedings. Because an ERISA violation is established (and a finding of bad faith is not required), the only remaining issue is the imposition of an appropriate equitable remedy, which we leave to the District Court consistent with our discussion in Part IV of this opinion.

On both claims, we leave open all issues not decided in this opinion, including whether any set-off or contribution against Leckey is appropriate given her position as co-trustee.